United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JANET HALEY,

Plaintiff,

v.

COHEN & STEERS CAPITAL MANAGEMENT, INC., et al.,

Defendants.

_______________________________/

No. C 10-3856 PJH

**ORDER GRANTING SUMMARY JUDGMENT IN PART AND DENYING SUMMARY JUDGMENT IN PART**

Defendants' motions for summary judgment came on for hearing before the court on March 21, 2012. Plaintiff Janet Haley ("plaintiff" or "Haley") appeared through her counsel, Mary Shea Hagebols, Jeffrey Allen, and Nina Paul. Defendant Cohen & Steers Capital Management, Inc. ("C&S") appeared through its counsel, Matthew Mason and Francis Ortman; and defendant David Edlin ("Edlin") (all collectively "defendants") appeared through his counsel, Catherine Conway. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS the motions for summary judgment in part, and DENIES them in part, for the reasons stated at the hearing, and as follows.

**BACKGROUND**

This is an employment discrimination case. Plaintiff Janet Haley was a female financial services industry sales representative for defendant C&S from February 2007 through August 2010. Plaintiff alleges that in connection with her employment with and termination from C&S, she was subjected to unlawful treatment on the basis of her gender and disability.

A. Haley's Initial Employment with C&S

C&S is an investment management company that manages income-producing

equity and fixed income portfolios for individual and institutional investors. See Declaration of Michele Nolty ISO MSJ ("Nolty Decl."), Dckt. 19, ¶ 5. In February 2007, C&S hired plaintiff as the Regional Sales Director ("RSD") and Vice President for its Northern California region. See Declaration of Damien P. Delaney ISO Edlin MSJ ("Delaney Decl."), ¶ 2, Ex. A at 25:23-26:2. Plaintiff's job was to sell C&S investment products to financial advisors, and to maintain C&S existing assets within her territory. See id., ¶ 2, Ex. A at 69:8-20, 70:19-71:4, 71:8-72:16. Plaintiff appeared to be highly regarded. See Declaration of Mary Shea Hagebols ISO Pl. Opp. re Edlin MSJ ("Shea Decl."), Ex. 20 at 21:6-16, 21:22-23. In February 2009, Haley was one of the top performers at C&S and ranked second of all the wholesalers. See Declaration of Janet Haley ISO Edlin Opp. ("Haley Decl."), ¶ 29.

In February 2009, defendant David Edlin was hired as the National Sales Manager for C&S – i.e., he became plaintiff's direct supervisor. See id., ¶ 2, Ex. A at 139:8-13. Edlin was hired by C&S to improve the productivity and professionalism of the C&S sales team. See Delaney Decl., ¶ 7, Ex. F at 161:13-162:16. Edlin was expected to evaluate the RSDs, identify areas for improvement, and implement changes where needed. Delaney Decl., ¶ 7, Ex. F at 161:12-162:16. One of his key expectations was that RSDs would conduct a minimum of 20 meetings per week with clients in the top 175 financial advisors in his or her territory. Delaney Decl., ¶ 12, Ex. K at 153:8-23.

Edlin earned a reputation as a demanding micro-manager and under his leadership, four male RSDs left the company. See Delaney Decl., Ex. B at 192:1-8; Ex. I at 128:10-12; Ex. J at 213:13-214:3; Ex. L at 33:7-15; see also Nolty Decl., ¶ 3.

B. Edlin's Sales Visit with Haley and Follow-up Phone Call

Haley and Edlin had their first face to face meeting on March 9, 2009, when Edlin traveled to San Francisco to accompany plaintiff on two days of sales calls. See Delaney Decl., ¶ 2, Ex. A at 147:24-148:13. The two drove in the same car. During that visit, Edlin asked Haley questions about her personal life, and Haley shared with Edlin details about her personal life, including the fact that she was planning to break up with her boyfriend.

See id. at 149:19-25; see also Haley Decl., ¶ 33.

On March 10, 2009, the second day of Edlin's trip to San Francisco, plaintiff contends that Edlin awarded plaintiff the Pac West territory, expanding her territory to Alaska, Oregon, and Washington, and noting that the Southern California wholesaler, Chad Feilke, would have his territory adjusted northward. Haley Decl., ¶¶ 35-37; Shea Decl., Ex. 13 at 102:22-105:3. That same day, Edlin sent plaintiff an email stating that he was very impressed by her consultative approach, product knowledge, professional style, positive nature, and access to the right financial advisors. Shea Decl., Ex. 2; Haley Decl., ¶ 39.

Edlin, however, states that no official territory award was made, simply that he asked plaintiff about her "interest" in possibly taking over the sales territory. Plaintiff purportedly expressed concern about the additional travel, but stated she would "welcome the opportunity." See Declaration of Matthew J. Mason ISO MSJ ("Mason Decl."), Ex. A at 158:25-159:4, 163:18-164:11.

Subsequent to Edlin's visit to California, on March 25, 2009, Edlin called Haley to discuss the recent visit. Beyond this fact, the parties differ as to their characterization of the phone call:

**Haley's version**. During this telephone conversation, plaintiff states that the two had a disagreement about the reassignment of Santa Barbara. Haley Decl., ¶¶ 41-43. Edlin then purportedly asked Haley if she was "depressed," recalling that Haley had previously mentioned to him that she was going to break up with her boyfriend. Haley Decl., ¶ 44. He asked how the break up with her boyfriend went. See Delaney Decl., Ex. A at 248:12-16. After Haley responded that she was "okay with it," Edlin allegedly asked Haley "did you get any pleasure from it?" See id. at 248:18-19. Haley responded to this question by asking Edlin if he "just ask[ed] if [she] had break-up sex with [her] boyfriend." Id. at 248:21-23. Haley contends that Edlin responded to this question in the affirmative and further asked if the breakup sex was "hard enough to knock the bad attitude out of you." Haley Decl., ¶ 44. Haley then contends she told Edlin that he needed to get

United States District Court
For the Northern District of California

someone from human resources on the line if he wanted to discuss her sex life. See Delaney Decl., Ex. A at 248:23-249:11. Edlin purportedly responded by stating that her “reputation around the company was unearned,” and that she “wasn’t long for the company.” Id. at 249:14-17. Edlin purportedly also said “You can keep Santa Barbara. I’m not giving you the Pac West.” Haley Decl., ¶ 46.

**Edlin’s version**. Edlin admits that he had a telephone conversation with plaintiff in March 2009 where he discussed the fact that she had broken up with her boyfriend. See Shea Decl., Ex. 3 at 283:4-8. Aside from this, he has no memory of the subject matter of the phone call with plaintiff. See id. at 330:24-332:10, 332:18-24.

Following the phone call, on March 31, 2009, plaintiff sent an email to Edlin, letting him know that C&S was expected at the Portland and Seattle new recruit integration meetings. Plaintiff also sent Mike Cuneo – an individual who had previously covered the Pac West territory – an email with a list of her top 175 advisors, including Pac West prospective clients. See Haley Decl., ¶ 54. That same day, Edlin replied that no territory adjustments were being made at that time. Shea Decl., Ex. 5.

On April 3, 2009, Edlin sent Haley an email purportedly criticizing her performance, and informing her that her job was in jeopardy unless she brought her performance in line with the new expectations and goals he required of the RSDs. Delaney Decl., Ex. K at 152:2-154:21, 155:15-19. 158:10-17; Ex. N; Shea Decl., Ex. 9.

Up to this point, Haley had not reported and did not report the March 25, 2009 conversation with Edlin to the C&S Human Resources Department (“HR”). Delaney Decl., Ex. A at 261:23-24. In mid-April, however, Haley complained about Edlin to Terry Ober, one of her colleagues whom she told about the alleged telephone incident. See Delaney Decl., Ex. D at 279:24-280:3; Ex. I at 55:14-56:8, 57:7-14; see Shea Decl., Ex. 10 at 140:1-25. Ober discussed the incident with C&S recruiter Tracee Cannon-Gordon, who testified that Mr. Ober originally believed plaintiff’s allegations, and that all of the wholesalers she dealt with thought Edlin was sexist. Shea Decl., Ex. 10 at 37:2-7, 65:1-68:14.

United States District Court
For the Northern District of California

Between March 25, 2009 and June 4, 2009, the phone call incident was reported to HR – either by Mr. Ober or some other of plaintiff's co-workers or superiors at the vice president level or above. Haley Decl., ¶ 52. HR initiated an investigation. In April 2009, Michele Nolty, C&S Senior Vice President of Human Resources, called plaintiff asking if she was having "a problem." Haley Decl., ¶ 55. During the call, plaintiff (who feared for her job) became quite upset and explained to Ms. Nolty that she could not talk about "this" at that time. Shea Decl., Ex. 22 at 337:16-19. At the investigation's conclusion, HR found Haley's allegations to be unsubstantiated. Delaney Decl., Ex. D at 333:13-334:1; Ex. K at 132:4-22.

On June 4, 2009, plaintiff asked for a territory change to the now available Washington, D.C. metro area. She was told that the ultimate decision was up to Edlin because plaintiff reported to him. Shea Decl., Ex. s at 344:9-344:17; Haley Decl., ¶ 58. A few hours after plaintiff requested a transfer, she was contacted by Mr. McCombe of C&S and told to fly to New York City because a complaint had been made against Edlin and C&S HR needed to speak with her. Haley Decl., ¶ 58. In New York, plaintiff met with Mr. McCombe, then with Ms. Nolty and Mr. McCombe, then with Ms. Nolty, Edlin, and McCombe. Id., ¶ 59.

Plaintiff was later informed that C&S believed that Edlin's offensive comment of a sexual nature was a "miscommunication" and that they "must learn to work together." Haley Decl., ¶ 60. On July 15, 2009, Ms. Nolty sent plaintiff an email stating that the Pac West territory had never been assigned to plaintiff and threatening plaintiff with disciplinary action if she made false accusations or was insubordinate. See Shea Decl., Ex. 25.

In July 2009, plaintiff was informed by Ms. Nolty that Edlin had denied her transfer to Washington, D.C. Haley Decl., ¶ 61.

In August 2009, during a conference call with all wholesalers, plaintiff alleges that Edlin spent the majority of the call asking plaintiff question after question in an aggressive tone, while refraining from questioning the other wholesalers in a similar manner. Shea

Decl., Ex. 13 at 222:8-223; Shea Decl., Ex. 10 at 63:12-64:2. After the call, several of the wholesalers called each other to discuss what had happened. Shea Decl., Ex. 13 at 222:21-223:16. Several wholesalers observed that Edlin was targeting plaintiff. Shea Decl., Ex. 13 at 222:8-224:11; Shea Decl., Ex. 20 at 52:7-21.

By the same token, Edlin's assistant noted that it was plaintiff who was rude to Edlin on calls, not the other way around. Mason Decl., Ex. CC, ¶¶ 4, 12.

C. Haley's Performance Evaluations

C&S contends that by May 2009, Edlin had identified a "short list" of four wholesalers he was considering terminating based on their failure to embrace his consultative model, poor presentation skills, failure to schedule sufficient meetings, and sometimes "combative" behavior. See Mason Decl., ¶ 9, Ex. H at 255:15-257:24. Plaintiff was the fourth person on the list. Nolty Decl., ¶ 4.

On August 27, 2009, Edlin presented Haley with her mid-year review for 2009. Delaney Decl., Ex. C at 363:6-15. This was the only formal review of Haley that Edlin ever prepared. At the time of the review, Haley's territory was ranked 7th out of 12 in sales performance. See Delaney Decl., Ex. O. Haley's contact with her top 175 financial advisors was below the average among RSDs; only 39% of her sales meetings were with her top 175 advisors. See id. Edlin stated in Haley's review that Haley "had demonstrated solid sales presentation and skill set;" and has the "qualifications and experience to be a true leader in her territory." Delaney Decl., Ex. O. The review was mainly critical, however, stating that Haley's sales results needed improvement, and questioning her "business acumen." Id. The negative comments related to Haley's below-average contact with and sales from the top 175 advisors mirrored comments Haley had previously received from prior managers. Delaney Decl., Ex. P-Q.

Haley responded to her review in a one page typed rebuttal, which C&S attached to the review. Delaney Decl., Ex. O. Haley challenged the criticism leveled against her in her review by pointing out that she was the top producer in the organization's "focus effort," and

United States District Court
For the Northern District of California

that her "product mix was also among the best in the group." Id.

On June 3, 2009, plaintiff traveled with Martin Cohen, Co-Chairman of C&S. Cohen allegedly told plaintiff that he was impressed and proud to have her on the team. Haley Decl., ¶ 57.

D. Haley's Medical Leave

On November 9, 2009, Haley was diagnosed with lymphoma, a type of cancer. Delaney Decl., Ex. C at 377:2-4. Haley reported the diagnosis to C&S after the Thanksgiving holiday. Id. at 377:5-9. Haley took a paid medical leave of absence from her employment, from March 2010 through May 2010. See Delaney Decl., Ex. C at 385:10-386:4.

Haley contends that she discussed her prospective leave of absence with Edlin on one occasion in February or March 2010. According to Haley, during this conversation, Edlin referred to her medical absence as a "lifestyle issue" and "equated it to a junior partner who wanted time off to coach volley ball." See FAC, ¶ 30.

After her return from leave in May 2010, Haley contends that Edlin told her that she should consider herself on probation and that she needed to triple her sales. Delaney Decl., Ex. C at 391:12-19. In July 2010, plaintiff was ranked number 3 amongst all the wholesalers. Haley Decl., ¶ 82.

E. Haley's Termination

In August 2010, 15 months after HR's investigation into Haley's claims regarding Edlin's purported sexual innuendos, Haley attended an industry friend's funeral. Delaney Decl., Ex. C at 400:3-19. On the way to the service, plaintiff drove with her friend, Craig Horan, who asked her how work was going. Plaintiff shared with Mr. Horan some of the difficulties she had experienced with Edlin. Haley Decl., ¶ 77. After the service, Haley went to a dinner in San Francisco with a large group of people, including competitors and clients of C&S. Id. at 400:22-401:9. Present amongst the people there was Heidi Richardson, Mr. Horan's girlfriend, and a former colleague of Edlin's. That evening,

United States District Court
For the Northern District of California

Richardson sent text messages to Edlin stating that Haley had made several denigrating comments about Edlin. Delaney Decl., Ex. F at 219:13-22, 219:25-220:6, 220:10-17, 220:25-221:16; Ex. H at 65:6-14. Unbeknownst to plaintiff, Mr. Horan had shared with Richardson his conversation with plaintiff from their car ride earlier that day. See Shea Decl., Ex. 19 at 36:18-37:25. Edlin texted Richardson back to ask whether Haley was "telling everyone at dinner," to which Richardson responded that it was a "close crowd." Delaney Decl., Ex. F at 221:17-24.

Edlin complained about this incident to HR, which investigated the incident on August 18, 2010. Delaney Decl., Ex. F at 224:15-17, 225:10-14; Haley Decl., ¶ 77.

On August 20, 2011, Richardson sent an email to Edlin stating that plaintiff did not say anything bad about C&S and admitting that Mr. Horan had started the conversation regarding Edlin and that Richardson was privy to plaintiff's private conversation with Mr. Horan. Shea Decl., Ex. 23.

A few days later, C&S informed plaintiff that she was not "meeting expectations" and that she was "no longer employed with" C&S. Haley Decl., ¶ 79. C&S offered Haley the opportunity to resign, or to face termination. Delaney Decl., Ex. C at 468:8-18; Ex. K at 261:8-24, 264:19-265:5, 278:7-17, 279:3-20.

As of August 2010, plaintiff had never received any written warning that she was at risk for being terminated, nor had Edlin told plaintiff that she was at risk of being terminated for unsatisfactory performance, or told plaintiff that she was at risk of being terminated because she was not meeting expectations. Shea Decl., Ex. 3 at 299:2-6, 299:15-300:6.

F. Procedural History

Haley filed a charge with the California Department of Fair Employment and Housing ("DFEH") on August 25, 2010. See Mason Decl., Ex. P. Haley then filed the instant action on August 27, 2010. The operative first amended complaint ("FAC") was filed on November 16, 2010.

The FAC asserts six claims against defendant C&S, and three claims against

defendant Edlin. The claims asserted against C&S are: (1) gender discrimination; (2) violation of the Americans with Disabilities Act ("ADA"); (3) disability and gender harassment; (4) retaliation; (5) intentional infliction of emotional distress; and (6) wrongful termination. The claims asserted against Edlin are: (1) disability and gender harassment; (2) intentional infliction of emotional distress; and (3) defamation. See generally FAC.

Defendants have each individually moved for summary judgment.

**DISCUSSION**

A. Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. S. Cal. Gas. Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

B. Legal Analysis

Defendants' motions for summary judgment collectively require analysis of all eight of plaintiff's asserted claims: (1) plaintiff's Title VII claim alleging gender discrimination (against C&S); (2) the ADA claim (against C&S); (3) the FEHA claim alleging disability and gender discrimination (against C&S); (4) the FEHA claim alleging disability and gender harassment (against C&S and Edlin); (5) the FEHA claim alleging retaliation (against C&S); (6) the claim for intentional infliction of emotional distress (against C&S and Edlin); (7) the defamation claim (against Edlin); and (8) the claim for wrongful termination in violation of public policy (against C&S). In addition, defendant C&S challenges plaintiff's ability to support her request for punitive damages.

As a preliminary matter, the court takes note of the fact that defendant has raised numerous evidentiary objections to the evidence submitted by plaintiff. Many of defendant's objections are boilerplate objections that assert lack of personal knowledge, speculation, and hearsay. Some of defendant's objections, however – particularly on hearsay grounds – are well-taken. Accordingly, with respect to those claims that survive summary judgment and for which plaintiff relies upon such evidence, the court has in turn relied upon only those portions that it believes are admissible at this juncture, as referenced below.

The court also preliminarily notes that the framework for proving disparate treatment claims – whether premised on gender or disability – is well-established, and is guided by the burden-shifting format established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, a plaintiff must first prove a prima facie case of discrimination by showing that he is a member of a protected class; that he was performing his job duties in a competent and satisfactory manner; that he suffered an adverse employment action; and that some similarly situated individuals outside the protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1156 (9th Cir. 2010); Guz v. Bechtel Nat. Inc., 24 Cal. 4th 317, 355- 56 (2000). The

United States District Court
For the Northern District of California

Ninth Circuit has repeatedly emphasized that a plaintiff's burden in establishing a prima facie case of discrimination is "minimal." Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1094 (9th Cir. 2005).

Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment decision. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). An employer's reasons need not rest on true information. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002). Instead, courts require only that the employer "honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." Id. (citation and quotation omitted).

If the employer meets this burden, the plaintiff must then raise a triable issue of material fact as to whether the defendant's proffered reasons for its actions are a mere pretext for unlawful discrimination. Hawn, 615 F.3d at 1155. A plaintiff may do this by producing either direct evidence of discriminatory motive, which need not be substantial, or circumstantial evidence that is "specific and substantial" evidence of pretext. Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221-22 (9th Cir. 1998). If the plaintiff succeeds in demonstrating a genuine issue of material fact as to whether the reason advanced by the employer was a pretext for discrimination, then the case proceeds beyond the summary judgment stage. See Reeves, 530 U.S. at 143.

A plaintiff's subjective belief that his termination was unnecessary or unwarranted is not sufficient to create a genuine issue of material fact. See Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006). In addition, "[a] plaintiff cannot defeat summary judgment simply by making out a prima facie case." Wallis v. J.R. Simplot Co., 26 F.3d 885, 890 (9th Cir. 1994) (quoting Lindahl v. Air France, 930 F.2d 1434, 1437 (9th Cir. 1991)). Rather, the plaintiff must produce "specific, substantial evidence of pretext." Id. (quoting Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir.1983)).

The foregoing burden-shifting approach is the same under Title VII and FEHA, since

United States District Court
For the Northern District of California

California courts look to federal case law in the interpretation of analogous provisions of the FEHA. See Hersant v. Cal. Dep't of Soc. Servs., 57 Cal. App. 4th 997, 1002 n.1 (1997); see also Brooks v. City of San Mateo, 229 F.3d 917, 923 (9th Cir. 2000).

With this legal overview in mind, the court now turns to the claims before it, and addresses the parties' arguments collectively, claim by claim.

1. Title VII Gender Discrimination Claim (against C&S)

Plaintiff alleges that C&S, through the actions of Haley's supervisor Edlin, unlawfully discriminated against plaintiff because of her gender, in violation of Title VII. As noted, to succeed in establishing a prima face case of disparate treatment on the basis of plaintiff's gender, plaintiff must demonstrate (1) that she belongs to a protected class; (2) was performing according to her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) that other employees with qualifications similar to her own were treated more favorably. See McDonnell Douglas, 411 U.S. at 802; Godwin, 150 F.3d at 1220.

It is undisputed that plaintiff belongs to a protected class, and/or that plaintiff suffered an adverse employment action via her termination. What is disputed is whether plaintiff was performing according to her employer's legitimate expectations; and/or whether other employees with qualifications similar to plaintiff's were treated more favorably. Plaintiff submits the following evidence in support of both requisite elements: that Edlin himself testified that prior to her termination in August 2010, he was not intending to recommend plaintiff's termination for any performance reason; that Mr. McCombe (a C&S executive) considered plaintiff's performance to be satisfactory and noted that plaintiff ranked in the top half of wholesalers during her tenure with C&S; that Edlin's own emails prior to his March 2009 phone call with plaintiff belie Edlin's purported criticisms of plaintiff's performance; that plaintiff exceeded sales meetings goals; and that male employees who were in fact required to leave for performance reasons were not subjected to the same negative comments on their terminating Form U5s, but instead received no comments, a

United States District Court
For the Northern District of California

fact that allowed them to continue their sales careers elsewhere. See Shea Decl., Ex. 2; Ex. 3 at 305:22-306:4; Ex. 9; Ex. 28 at 63:12-16, 79:13-80:25, 86:12-87:25; Ex. 35-36; Martin Decl., ¶¶ 5, 7; Megorden Decl., ¶¶ 5-9; see also Haley Decl.

Defendant C&S, by contrast and in opposition, avers that plaintiff's termination was motivated by "cumulative factors" that did not include gender. See, e.g., Declaration of Robert Steers ISO MSJ ("Steers Decl."), ¶¶ 5, 7. These "cumulative factors" included the following: plaintiff's failure – over a year and a half – to meet the minimum requirements of the focused strategy that Edlin was hired to implement, including plaintiff's failure to conduct a minimum of twenty substantive meetings per week, and to follow Edlin's consultative approach to sales presentations; plaintiff's purportedly rude and insubordinate behavior towards her direct supervisor; and in August 2010, C&S's receipt of information about plaintiff's allegedly derogatory comments about Edlin to C&S competitors and clients. See id.; see also Mason Decl., Ex. 13 at 180:1-4, Ex. 19 at 362:18-363:15, Ex. WW at 361:4-363:10; see also Edlin Decl., ¶¶ 5-6; Cejak Decl., ¶ 12. All of which, contends defendant, demonstrates that plaintiff was terminated for a legitimate nondiscriminatory reason.

On balance, the court concludes that a triable issue of material fact exists as to whether plaintiff can establish a prima facie case of gender discrimination. Plaintiff has submitted, at a minimum, some specific evidence demonstrating that by certain measures and rankings, her job performance was satisfactory. Edlin himself, for example, saw certain positive attributes – including a consultative sales approach – that plaintiff possessed prior to the alleged March 2009 call with plaintiff. Plaintiff has also introduced evidence suggesting that other male employees may not have received the same type of negative Form U5 that plaintiff received. While defendant has submitted its own evidence that Edlin and others felt plaintiff was not performing according to the expectation that plaintiff's meetings be held most of the time with the "top 175" financial advisors or following the "consultative sales approach" that Edlin wanted followed, these contradictory

versions of plaintiff's actual performance throughout her time at C&S – and the timeline pertaining to these different versions – fundamentally raise credibility issues that the jury is entitled to resolve in order to determine whether plaintiff's performance was, in fact, satisfactory and whether plaintiff was, in fact, treated worse than other male employees.

Accordingly, defendant C&S' motion for summary judgment with respect to plaintiff's Title VII gender discrimination claim is DENIED.

2. ADA Claim (against C&S)

Disparate treatment claims under the ADA are also analyzed under the above-referenced burden-shifting framework of McDonnell-Douglas. Generally speaking, a plaintiff's prima facie case of discrimination based on a disability must show that plaintiff: (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of his/her disability. Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001).

Plaintiff contends that C&S unlawfully discriminated against her because of her cancer diagnosis, premised on the following: Edlin demanded a business plan from plaintiff on the same day she received chemotherapy, and while plaintiff was on intermittent leave; Edlin put plaintiff on "warning and told her to triple her sales or risk termination" upon plaintiff's return from medical leave; Patrick Evans, another wholesaler, testified that he believed Edlin was targeting plaintiff due to her cancer; plaintiff told Ms. Nolty that Edlin's harassment is what caused her to take full medical leave; C&S failed to take any steps to investigate plaintiff's allegation that Edlin's harassment was forcing her to take medical leave; and Edlin referred to plaintiff's decision to take leave to fight cancer as a "lifestyle choice." See Shea Decl., Exs. 15, 16, 41; see also Haley Decl., ¶¶ 67, 69, 70, 72.

C&S, however, correctly targets plaintiff's ability to introduce a triable issue of fact as to the third element of her prima facie claim – i.e., the requirement that plaintiff have suffered an adverse action by reason of her disability. Plaintiff contends, for example, that she was requested to submit a business plan while on intermittent leave. However, as

United States District Court
For the Northern District of California

defendant points out, plaintiff herself chose to be on intermittent leave – which meant that she was expected to work on certain days on which she indicated that she was working. See Nolty Decl., Ex. D. Plaintiff also contends, via her own declaration, that she took full medical leave in spring 2010 because of Edlin's harassment, and that although Ms. Nolty was aware of this, C&S took no steps to investigate plaintiff's statements to Ms. Nolty indicating that a medical leave was required due to Edlin's harassment. However, there is no evidence corroborating C&S' knowledge of and refusal to investigate plaintiff's statements regarding leave, and defendant's own declaration is insufficient to create a triable issue as to this fact. See, e.g., FTC v. Publ'g Clearing House Inc., 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). More importantly, however, there is simply no evidence establishing that it was *disability-related* harassment that caused plaintiff to take a full medical leave in the first place.

Similarly, to the extent plaintiff contends that upon her return from medical leave, Edlin told her she needed to triple sales "or risk termination," plaintiff provides no evidence that this statement, to the extent made, was made because of or in connection with her medical leave or disability. And while plaintiff does assert that Edlin specifically referenced plaintiff's disability by stating that plaintiff's decision to take leave was a "lifestyle choice," this comment fails to concretely implicate plaintiff's disability, or to provide a link between plaintiff's cancer diagnosis, and any adverse action – e.g., termination – taken against plaintiff.

More fundamentally, plaintiff simply presents no evidence that her termination was in any way causally related to Edlin's "lifestyle choice" statement, or any other *disability-related* conduct. In short, there is simply no indication in the record that plaintiff's cancer and/or medical leave was a factor in her termination.

Plaintiff thus fails to come forward with evidence demonstrating that she was terminated "*because of* her disability," and fails to introduce any triable issue of fact with

respect to her prima facie claim of disability discrimination.

Accordingly, the court GRANTS defendant C&S' motion for summary judgment in connection with plaintiff's ADA claim alleging disability discrimination.

3. FEHA Disability/Gender Discrimination Claim (against C&S)

As analysis of the law under FEHA is analogous to analysis under federal law, the same analysis that extends to the foregoing two claims under Title VII and the ADA pertains to plaintiff's FEHA claim against C&S based on the same grounds.

Accordingly, defendant's motion for summary judgment with respect to plaintiff's gender discrimination claim pursuant to FEHA is DENIED; but the motion for summary judgment with respect to plaintiff's disability discrimination claim under FEHA is GRANTED.

4. FEHA Disability/Gender Harassment Claim (against C&S/Edlin)

Plaintiff also alleges a claim for harassment on the basis of both her gender and/or disability, against both C&S and Edlin. Generally, to establish a claim for harassment, plaintiff must prove unwelcome conduct based on gender or disability that is "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." See Cal. Gov. Code § 12940(j)(i). Furthermore, the prohibition of harassment "forbids only behavior so objectively offensive as to ... create a hostile or abusive work environment." See Lyle v. Warner Bros Tel. Prods., 38 Cal. 4th 264, 282-83 (2006). Whether an environment is hostile or abusive can be determined "only by looking at all the circumstances [including ] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 283. Merely "offensive comments" in the workplace are not actionable. See id.

Defendants here isolate plaintiff's reliance on two instances of "harassing" behavior: (1) Edlin's comment to plaintiff regarding "break up sex" and whether it had been "hard enough to knock the attitude out of her;" and (2) Edlin's purported reference to plaintiff's medical leave as a "lifestyle choice." Defendants assert that neither comment was

United States District Court
For the Northern District of California

sufficiently severe or pervasive to constitute a claim for harassment based on either gender or disability. Plaintiff, who does not dispute her reliance on these two instances as a basis for her harassment claim, in response asserts that the collective evidence she has marshaled in support of her claims, when taken into account together with the foregoing instances, supports her harassment claim. For example, plaintiff specifically contends that in addition to the foregoing instances, Edlin humiliated her on conference calls and face to face; targeted her; threatened her with disciplinary action; prevented her from moving back to the east coast to be with her terminally ill father; removed territories away from her; denied her commission; demeaned her cancer and interfered with her medical leave; threatened her with probation; and caused her to be terminated. See, e.g., Haley Decl., ¶ ¶ 44-46, 53, 61-64, 70-74; Shea Decl., Ex. 6 at 112:1-3, Ex. 9, Ex. 10 at 45:6-25; Ex. 13 at 222:19-223:11, Ex. 14.

Defendants have the more persuasive argument. Beginning with the specific instances of harassing behavior relied upon by plaintiff, Edlin's isolated comment about "break up sex" and whether it was "hard enough to knock the attitude out of [plaintiff]" – unaccompanied by any physical threat – was not, on its own, sufficiently severe to constitute gender based harassment, as a matter of law. See Hughes v. Pair, 46 Cal. 4th 1035, 1049 (2009)("As noted earlier, employment law acknowledges that an isolated incident of harassing conduct may qualify as "severe" when it consists of "a physical assault or the threat thereof")(analogizing to FEHA). Moreover, as defendant C&S points out, while such a comment may be highly offensive, there is nothing inherent in Edlin's specific comments that demonstrates that such comments were inherently *gender*-based. Indeed, such comments might be stated in reference to a male employee just as easily as they may be stated to a female employee. See Lyle, 38 Cal. 4th at 280 ("it is the disparate treatment of an employee on the basis of sex – not the mere discussion of sex or use of vulgar language – that is the essence of a sexual harassment claim"). Similarly, Edlin's reference to plaintiff's medical leave as a "lifestyle choice" also fails, standing alone, to rise

to the requisite level of severity insofar as plaintiff's claim for disability-based harassment is concerned.

To the extent that plaintiff relies instead on the general collective nature of additional purported 'incidents' to establish harassment, moreover, plaintiff is relying on conduct that do not fall within the scope of 'harassment' as defined under the FEHA. According to the Fair Employment and Housing Commission (FEHA), the agency charged with administering the FEHA, 'harassment' on any basis prohibited by the FEHA includes (but is not limited to) "verbal harassment," including "epithets, derogatory comments or slurs on a basis enumerated in the Act"; "physical harassment," including "assault, impeding or blocking movement, or any physical interference with normal work or movement, when directed at an individual on a basis enumerated in the Act"; and "visual harassment," including "derogatory posters, cartoons, or drawings on a basis enumerated in the Act." See Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(1)(A), (B) & (C); see also Miller v. Dep't of Corr., 36 Cal. 4th 446, 461 (2005). Plaintiff's reliance on conduct purportedly undertaken by Edlin in connection with his treatment of plaintiff on conference calls, his performance-related statements and emails, and his decisions with respect to plaintiff's transfer and commission decisions, do not constitute qualifying verbal, physical, or visual harassment with respect to plaintiff's gender or disability.

In short, the isolated and collective instances of purported 'harassment' relied on by plaintiff fail to suggest a workplace that was "permeated with '[*gender-based* or disability-based] intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment.'" See Lyle, 38 Cal. 4th at 279 (emphasis added)(internal citations omitted).

Accordingly, defendants' motions for summary judgment with respect to gender and/or disability harassment under FEHA are GRANTED.

5. Retaliation Under FEHA (against C&S)

Plaintiff alleges that defendant C&S is liable for retaliation. In order to make out a

prima facie case of retaliation, a plaintiff must establish that (1) she acted to protect her rights; (2) that an adverse employment action was thereafter taken against her; and (3) that a causal link exists between those two events. See Yankowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005); see also Steiner v. Showboat Operating Co., 25 F.3d 1459, 1465 (9th Cir.1994).

The critical threshold inquiry for the court is to determine the instances of protected activity undertaken by plaintiff, and to isolate the allegedly retaliatory action taken against plaintiff in response thereto. This presents some difficulty. Plaintiff contends that she engaged in the following protected activities: (1) she objected to Edlin's sexually offensive comment during the March 25, 2009 phone call; (2) in mid-April 2009, plaintiff told Mr. Ober about the foregoing sexual comment and the fact that the Pac West territory had been taken away from her; (3) plaintiff participated in the investigation of her complaint (presumably during the June 2009 New York meetings about the allegation against Edlin); and (4) plaintiff continued thereafter to make other complaints to HR about Edlin's harassment and retaliation, and requested leave in 2010. See Delaney Decl., Ex. D at 279:24-280:3; Ex. I at 55:14-56:8, 57:7-14; see Shea Decl., Ex. 10 at 140:1-25; Haley Decl., ¶¶ 58-59; Shea Decl., Ex 25.

Plaintiff then alleges that in response, the following retaliatory adverse employment actions were taken against her: (1) the Pac West territory was removed from her territory in March 2009; (2) she was made to suffer a hostile work environment from March 2009 to August 2010; (3) she was denied a transfer to the Washington, D.C. territory in July 2009; (4) she received a defamatory performance review in August 2009; (5) she was told she was being placed on "warning" and informal probation in May 2010, following her return from leave; and (6) she was terminated in August 2010. Plaintiff rests proof of these incidents on her own declaration, and on the deposition testimony of fellow wholesalers and others, like Feilke, Gordon, and Joslin. See Shea Decl., Ex. 13; Ex. 10; Ex. 20; Haley

United States District Court
For the Northern District of California

Decl., ¶¶ 44-46, 53, 61-63, 66, 74, 79, 80.[1]

Defendant questions whether plaintiff can establish a prima facie case of retaliation based on the foregoing. Defendant asserts, for example, that the removal of the Pac West territory from plaintiff cannot constitute an adverse employment action, because there was only the possibility she could acquire the territory; and that any removal of such territory from plaintiff's purview would, at any rate, have occurred only 2 weeks after acquiring the territory – none of which demonstrates any "substantial and material" adverse consequence. Defendant also notes that plaintiff did not report the purported March 2009 phone call to Mr. Ober until mid-April 2009, and that if the Pac West territory removal was retaliatory, it therefore occurred *before* her report of the phone call to Mr. Ober – thus belying any causal connection establishing retaliation.

While these objections are valid, however, the court nonetheless ultimately concludes that plaintiff has presented enough to establish the existence of triable issues of material fact with respect to her retaliation claim. As a preliminary matter, crediting plaintiff's individual testimony, during the March 2009 phone call with Edlin, plaintiff told Edlin immediately following his inappropriate comment to her that he would have to "get HR on the line" if he wanted to know about her sex life. See Delaney Decl., Ex. A at 248:23-249:11. Treating plaintiff's initial invocation of the need for HR's involvement as a protected activity, the subsequent adverse employment actions that plaintiff highlights may very well suggest retaliatory conduct: e.g., Edlin's decision not to grant plaintiff the Pac West territory, his subsequent poor treatment of plaintiff on telephone calls (corroborated by other wholesalers), and his subsequent negative performance evaluation comments. See Brooks v. City of San Mateo, 229 F.3d 917, 928-29 (9th Cir. 2000)("Among those

---

[1] As intimated at the outset, defendant specifically objects on hearsay grounds to plaintiff's reliance on the Feilke, Gordon and Joslin deposition testimony, as well as to certain portions of plaintiff's own declaration. While defendant's objections are meritorious with respect to certain statements included therein, the court nonetheless finds that the evidence as a whole presents sufficient admissible statements to warrant substantive consideration at this juncture. However, nothing in the court's ruling is intended to preclude either party from renewing their evidentiary objections at the time of trial.

employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion").

Furthermore, treating plaintiff's invocation of HR's involvement in March 2009 as the initial protected activity, the subsequent pattern of conduct relied upon by plaintiff – all stemming from the March 25, 2009 phone call and eventually culminating in termination in August 2010 – is sufficient to satisfy the causal requirement of a prima facie retaliation claim.

All of which demonstrates that plaintiff has adequately introduced disputed and material issues of fact with respect to her retaliation claim under FEHA. The court accordingly DENIES defendant C&S' motion for summary judgment as to this claim.

6. Intentional Infliction of Emotional Distress (against C&S/Edlin)

Plaintiff's intentional infliction of emotional distress ("IIED") claim is stated against both defendants. The elements of a cause of action for intentional infliction of emotional distress are: 1) extreme and outrageous conduct by defendant, 2) intention to cause or reckless disregard of the probability of causing emotional distress, 3) severe emotional suffering, and 4) actual and proximate causation of the emotional distress. See Cole v. Fair Oaks Fire Prot. Dist., 43 Cal.3d 148, 155 (1970).

Plaintiff alleges that the totality of several incidents support her claim for intentional infliction of emotional distress against both defendants: the March 25, 2009 phone call in which Edlin asked plaintiff if she had had "breakup sex" and wondered if it was "hard enough to knock the bad attitude out of her;" Edlin's comments that plaintiff was "lazy" and "not qualified;" Edlin's call to recruiter Tracee Cannon-Gordon telling her to "keep an eye out" for a replacement for plaintiff; Edlin's "targeting" of plaintiff in weekly telephone calls; Edlin's reference to plaintiff's cancer diagnosis as a "lifestyle choice"; Edlin's demand that plaintiff work while on intermittent leave; and Edlin's demand that plaintiff triple her sales and should expect probation, when plaintiff returned from leave. See, e.g., Haley Decl., ¶¶

United States District Court
For the Northern District of California

63-67, 74; Shea Decl., Ex. 13 at 222:21-223:16, Exs. 14-15.  As plaintiff does in connection with her prior claims, she generally relies on the collective nature of these incidents, as opposed to a single isolated incident, to establish grounds for an IIED claim.

Defendants, for their part, challenge plaintiff's ability to demonstrate satisfaction of the first and third elements of plaintiff's IIED claim: "extreme and outrageous" conduct; and an intent to cause sufficiently "severe" emotional suffering.

With respect to the "outrageous conduct" element, courts have set a high bar for what constitutes sufficiently outrageous conduct.  "Conduct, to be 'outrageous,' must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." Trerice v. Blue Cross, 209 Cal. App. 3d 878, 883 (1989).  "Severe emotional distress means ... emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." See Fletcher v. W. Nat'l Life Ins. Co., 10 Cal. App. 3d 376, 397 (1970).  Significantly, liability for intentional infliction of emotional distress "'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" See Hughes v. Pair, 46 Cal.4th 1035, 1051 (2009).  To that end, numerous instances of alleged sexual threats and insults in the workplace context have been held to fall short of the level of "outrageous" required to satisfy an IIED claim. See Delfino v. Agilent Techs., Inc., (2006) 145 Cal. App. 4th 790, 809 (anonymous e-mails graphically threatening physical harm insufficient);  Candelore v. Clark County Sanitation Dist., 975 F.2d 588, 590 (1992)(isolated incidents of sexual horseplay alleged by plaintiff took place over a period of years and were not so egregious as to support an IIED claim). Moreover, particularly with respect to criticism directed at an employee's work, courts have held that "rude" or "insensitive" remarks do not on their own justify an IIED claim.  See Schneider v. TRW, Inc., 938 F.2d 986 (9th Cir. 1991)(summary judgment granted where plaintiff alleged that supervisor "screamed and yelled in the process of criticizing her performance, threatened to throw her out of the department and made gestures she interpreted as threatening").

United States District Court
For the Northern District of California

Here, even viewing the totality of plaintiff's evidence, there are insufficient facts to satisfy the "outrageous" element, as that element has been construed by the courts. Plaintiff's evidence suggests at most the presence of "rude" and "insensitive" remarks that on one occasion referenced "break up sex" that was "hard enough to knock the bad attitude out of her," and on another occasion referenced her medical leave as a "lifestyle choice;" and other conduct that, although appearing to treat plaintiff in disparate fashion from other employees, does not rise to the level of such "outrageous" conduct that it goes beyond the lines one is expected to tolerate in a civilized society.

Even if the court were to find that the evidence collectively presents a triable issue as to the 'outrageous' element of plaintiff's IIED claim, the court remains hard pressed to conclude that plaintiff can introduce a triable issue as to defendants' intent to cause emotional suffering. For as defendants point out, plaintiff has failed to introduce any evidence that either defendant intended to cause emotional suffering as a result of the alleged conduct, which suffering must additionally be sufficiently severe.

Accordingly, and in sum, the court GRANTS defendants' motions for summary judgment with respect to plaintiff's IIED claim.

7. Defamation Claim (against Edlin)

Plaintiff asserts a defamation claim against Edlin, premised on the performance review that Edlin gave plaintiff on August 27, 2009. See Delaney Decl., Ex. O. Plaintiff specifically alleges that Edlin defamed her by accusing her of being "lazy," "not qualified," and "not long for the firm;" denying that he granted her the additional territories (implying that plaintiff was dishonest in her contrary representations); and noting that plaintiff's clients did not respect her. See Complaint, ¶¶ 38, 50, 58; see also Pl. Edlin Opp. Br. at 21:27-22:12.

Preliminarily, both parties acknowledge the applicability of Jensen v. Hewlett-Packard Co., 14 Cal. App. 4th 958 (1993) to this case. In Jensen, the California appellate court expressly considered the question whether a former employee may premise a libel

United States District Court
For the Northern District of California

suit against a former supervisor on contentions contained within an employee performance review. See id. As an initial matter, the Jensen court noted, "we express our strong judicial disfavor for libel suits based on communications in employment performance reviews...". See id. at 964. The court also noted the importance of performance reviews, stating that "there is a legitimate raison d'etre for such records, and management has an unquestioned obligation to keep them. We would therefore be loathe to subject an employer to the threat of a libel suit in which a jury might decide, for instance, that the employee should have been given a rating of 'average,' rather than 'needs improvement,' or that the employee had an ability, unrecognized and unappreciated by a foolish supervisor, to get along with and lead others." Id. at 965. The court then went on to conclude: "we hold that unless an employer's performance evaluation falsely accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior, it cannot support a cause of action for libel." See also Polygram Records, Inc. v. Superior Court, 170 Cal. App. 3d 543, 550 (1985).

Applying Jensen to the facts before the court here, it clearly compels the court to find in favor of defendant Edlin with respect to plaintiff's defamation claim. Even a cursory review of the performance evaluation at issue fails to disclose any accusations of 'criminal conduct' or fundamental lack of integrity, dishonesty, or other reprehensible personal characteristics or behavior, such that it might support a cause of action for defamation. See Delaney Decl., Ex. O.

Plaintiff attempts to overcome this conclusion by pointing out that Edlin made statements to others that she was "not qualified," that her reputation was "unfounded," and/or that plaintiff was "not very good." See Pl. Edlin Opp. Br. at 22:3-16. Plaintiff also cites to additional case law in support of the contention that even "common criticism" in a performance evaluation might underlie an actionable defamation claim. See Agarwal v. Johnson, 25 Cal. 3d 932 (1979); Prevost v. First W. Bank, 193 Cal. App. 3d 1492 (1987). However, as defendant ably notes, plaintiff's reliance on these cases is misplaced. The

statements made about the employees in these cases were made outside of the performance evaluation process, and furthermore made to persons outside the company. Those facts are distinct from those presented here.

In sum, the court hereby GRANTS defendant Edlin''s motion for summary judgment with respect to plaintiff's defamation claim.

8. Wrongful Termination in Violation of Public Policy (against C&S)

Plaintiff also asserts a claim against C&S for wrongful termination in violation of public policy. However, because plaintiff's claim rests on the same allegations that underlie her other claims, and because the court has concluded that plaintiff's gender-based disparate treatment and retaliation claims present material disputes of fact, the court accordingly DENIES defendant's motion for summary judgment in connection with this claim, as well.

9. Punitive Damages

Finally, defendant C&S also contends that summary judgment is warranted with respect to plaintiff's request for punitive damages pursuant to Civil Code § 3294(a). This argument is well-taken. As defendant correctly notes, evidence of fraud, malice, or oppression – as required before a basis for punitive damages may be established – must be supported by clear and convincing evidence, even at the summary judgment stage. See, e.g., Basich v. Allstate Ins. Co., 87 Cal. App. 4th 1112, 1118-19, 1121 (2001)("If the plaintiff is going to prevail on a punitive damages claim, he or she can only do so by establishing malice, oppression or fraud by clear and convincing evidence. Thus, any evidence submitted in response to a motion for summary adjudication must necessarily meet that standard."). Here, however, there is a paucity of evidence establishing the type of conduct that would adequately support a finding of punitive damages. Indeed, plaintiff's argument in opposition to defendant's motion makes no serious attempt to rebut defendant's contrary argument with reference to concrete evidence, but states only in conclusory fashion that an adequate basis for punitive damages is present. This is

United States District Court
For the Northern District of California

insufficient.

Insofar as defendant would extend its argument to plaintiff's prayer for relief in connection with her Title VII claims, however, the court declines to find in defendant's favor. Title VII allows for punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). However, neither party has adequately briefed the question what type of evidence is required to support an inference of "malice" or "reckless indifference" (which the court takes to require a lower standard than "malice") in order to support an award of punitive damages pursuant to section 1981a.

Therefore, defendant C&S' motion for summary judgment is GRANTED to the extent it seeks a judgment that punitive damages are foreclosed pursuant to Cal. Civil Code § 3294(a), but to the extent defendant seeks to foreclose punitive damages pursuant to Title VII, defendant's motion is DENIED.

C. Conclusion

For the foregoing reasons, the court hereby GRANTS defendant Edlin's motion for summary judgment with respect to plaintiff's claims against him alleging harassment, intentional infliction of emotional distress, and defamation; and GRANTS in part and DENIES in part defendant C&S' motion for summary judgment with respect to all claims alleged by plaintiff against C&S.

**IT IS SO ORDERED.**

Dated: May 11, 2012

PHYLLIS J. HAMILTON
United States District Judge